Good morning and welcome to day three of the InBank panel. Today we have four cases to be orally argued. Judge Jones is on the screen as you see. She was unable to be here physically, but thus far this week the technology has overwhelmed me as to how smoothly it really has gone. So she's able to hear you and we'll be taking questions and so on and so forth. So other than that, it's really been quite smooth as far as the way things have gone. So we'll call the first case number 204-30730, United States v. Grace. Mr. Cottle. May it please the court. Your Honor, my name is Stuart Cottle. I represent Marshal Grace in this appeal of a criminal conviction, possession of intent to distribute methamphetamine, and a conviction for conspiracy to distribute methamphetamine. In my argument, I plan on primarily focusing on our assignment of error challenging the district court's determination regarding a Batson challenge, striking a juror on the basis of race, and then with the remainder of time, I will focus on our appeal of the conspiracy conviction. In this case, the district court below, the court erred by failing to correctly apply the steps to evaluate a challenge the juror was stricken on the grounds of race. As this court is well aware, there are three steps for evaluating such a challenge under Batson v. Kentucky. Number one, is there a prime facie case of discrimination? Number two, if so, the burden shifts to the prosecutor to provide a race-neutral explanation. And then three, the district court determines whether there was purposeful discrimination. Here, as the record below reflects, the district court did not correctly apply that three-step process by not evaluating the veracity of the prosecutor's reasons for striking a juror, but instead substituting and finding an additional reason for permitting the peremptory strike. This appeal concerns my client, Mr. Grace, who was an African-American and at trial was late 40s, and the juror in question, in which the Batson challenge was raised, Mr. Edward Davis, was an older African-American who stated that he had eight children, seven boys and one girl, and in response, during jury selection, the defense counsel raised a Batson challenge pointing out that at first saying two of three potential African-American jurors was stricken, later clarified it was two of four. And in response, the prosecutor's reason for exercising the peremptory strike with respect to this individual juror was that there wasn't much to go on for Mr. Davis except for the fact that we knew he had seven sons, and based on that information, not knowing much else about him, we chose that he would probably not be a great juror for the government. In response to that, the district court provided his initial response, which is as close, I think you'll find in the record, of a explanation. The district court said, I think you need more than that. Let's fast forward. We've read it. So let's just spot that the district court's sua sponte explication of answers from the prospective juror was not whatever. Okay. So let's assume for now that if you're leaning in on the district court shouldn't have done it. Okay. So let's just stay there. And so move to the point of having done that, if that's excised out, where are the prongs and where is the government and where are you focusing on here? In other words, not so much should the district court have done it, did it go too far? I assume that's beyond what the court should have done in terms of extracting it. But if you're left with the residue, the man had seven sons, he's asked all the questions, blah, blah, blah, and it's out. The government says, well, you can't just stop there. You've got to go further. So help us with understanding. Walk us through the prongs as they relate to your client. Yes, Your Honor. And so as it relates to my client, the prongs, and in this court's decision in Chamberlain, recognized that in evaluating the residue to reason, the district court's role was to test the veracity of the prosecutor's explanation. And that's where there was a breakdown in the process and where the district court erred by not testing the veracity and rather in later deciding to allow the preemptory strike, even said there's a whole other reason that was elicited from the juror about one of the sons having time spent in jail. But the reason for permitting the strike had nothing to do with the prosecutor's explanation. Let me ask it a different way. Are you arguing essentially down on the knee that once the district court did what it did, that the prosecutor's reasons were sort of tainted forever, no matter whatever else they said, that their reasons were tainted by what the district court extracted? I know those are my words, not yours, but I'm trying to get to the crux. Is that what you're saying? In other words, the government can never bail itself out. It's stuck with answers it didn't ask, but whatever else it says, the district court's reason was tinged with that. No, Your Honor. I don't think that's what we're arguing. I think the district court does have authority and discretion to conduct the proceedings as the court sees fit, but rather from the transcript and the record below, the reasons that were discussed later on for exercising the Primfrew strike and the court's reason for denying the challenge, it demonstrates that the court wasn't evaluating the prosecutor's reasons. So I don't think we're saying that the court couldn't even ask the prosecutor more questions. I think that's probably part of the role is to, by testing the veracity, is having a back-and-forth to figure out what's really going on here. The record doesn't reflect that with respect to this juror, any additional back-and-forth about why Seven Sons was a basis or a race-neutral reason for striking the juror. Yes, Your Honor. Mr. Cottle, a preemptory strike used to be a strike for any reason whatever, good or bad or indifferent. Seven Sons may not be good, it may be indifferent, but how does it imply racism of any kind, which is the point of Batson? Thank you for your question, Your Honor. I think on its face, Seven Sons doesn't necessarily imply a race-based reason. I think there's, in many cases, that it could be a basis. But here, the district court's response to it was that he wasn't convinced because, in this case, there was an African-American defendant. He had an older African-American male with seven sons, one or more of which would have been similar age demographic as the defendant. And so I think in this case, the district court's reaction to that explanation was initially that he wasn't believing the explanation. So I guess to answer your question, I think it's not that we're saying Seven Sons is inherently not a race-neutral reason, but in this case, based on the district court's response, that it wasn't a valid explanation. Do we have to infer that, and I won't bother you anymore, do we have to infer that the district court disbelieved the prosecutor or just he was asking for him to expand? I think the record reflects that the district court didn't believe the prosecutor's explanation or didn't find it convincing. And the fact that the I think it's further demonstration that that explanation wasn't convincing. When you began, you laid out the three Batson steps, and of course, step three is proving purposeful, purposeful discrimination. And I'm just struggling with what affirmative evidence of discriminatory intent there is in this record. Purposeful discrimination is a pretty high bar. And I just don't, what am I overlooking? What affirmative evidence is there of intentional discrimination? Thank you, Your Honor. To start, as the court knows, there only needs to be one exercise improperly of a primitive strike for there to be a constitutional violation. And so the evidence is based on this one juror. And that this juror was stricken, who was an African-American male with multiple children, but the focus was on the sons, not even the daughter. It wasn't about the number of children. The explanation limited to he had seven sons, demonstrating, which I think was the district court's reaction, was you're striking this juror because he has sons perhaps similar age and demographic as the defendant. That's the evidence. Beyond that, there isn't more because the district court didn't further evaluate that explanation. And that's also part of the error, part of our appeal, is that the district court didn't exercise its role properly under Batson to evaluate that so that there would be a fuller record on was this purposeful or not. But instead, the district court found an unknown reason at the time that exercises strike, a different reason. So the district court recalled the juror, elicited some additional information. Do you agree that we've got to disregard those court-elicited facts? Yes, and the government's brief even recognizes that's not part of the inquiry. And I don't think there's a categorical bar, again, of the district court exercising discretion to figure out how to evaluate it. But the types of questions and the evidence elicited did not further evaluate or test the veracity of the prosecutor's reasons. And that's, I think, why that questioning is irrelevant to the original strike, because the importance is in controlling to make sure that even in one instance a strike wasn't exercised improperly. Batson instructs us it's not about whether there could be a reason to strike. Okay, cut to the chase. I must have missed it. I'm slow. It's Wednesday. But come back to the question Judge Woolard asked you. Yes, Your Honor. Okay, what's in the record? I've read the full transcript. I read all these questions and all of that. So tell me, so what is the demonstration of purposeful discrimination? That's what he asked you. You may have answered it and I missed it. And I apologize if I wasn't clear. The only evidence is that the prosecutor exercised a strike with respect to this one juror for the reasons that he had seven signs. There isn't more than that. But how is that the evidence of purposeful discrimination? That's what you were asking. I hear you saying, you know, that answer is kind of phony, you know, not believable, et cetera. But the question is, how does that answer, whatever way you characterize it, translate into purposeful discrimination? That's the question, you know, we're trying to get to. And thank you, Your Honor. There isn't more than that because the court didn't rule on that. So the only evidence I can to is the district court's reaction to it. And I understand that you're maybe distinguishing that response isn't the same thing as purposeful discrimination. There isn't more because the district court didn't. No, no, no. But see, on the one hand, it's a case of the district court did too much. He asked questions he shouldn't have. Once upon a time, I was a trial judge, I would have just said, okay, counsel, that dog is not hunting seven sons. You want to ask someone a question and left it at that. They did, they did. But in this case, Judge Saini, and you said we all know the judge has a right to, has a responsibility to see the fair and impartial juror, so he asked a question. But let's just say he perhaps went too far. But still the point, you dial back to Batson and that's even if your argument is that the procedure was not perfect, in order for you to get relief, you've got to demonstrate that whether the prosecutor's responses were great or whatever, but do they demonstrate purposeful discrimination or said a different way, was there a layer uncovered that the district court didn't go in terms of that? You understand what I'm saying? So, I mean, what's the, where in here do we find that? I can't point to anything more than what I've shared in terms of evidence in the record, but I do think the error isn't so much as we have to find evidence of purposeful discrimination on this record because part of our appeal is also a legal question of whether the process was correctly. All right, now I took some of your time. I'm going to give you two more minutes to deal with the conspiracy part if you want to talk about it, but let me ask it this way. You articulate for me what you would say this panel's holding would be in this case with respect to your Batson client. What is it that we would hold in order for your client to get relief? Two points, Your Honor. That exercising a preemptory strike of an African-American juror when you have an African-American defendant solely because he had seven sons and not referencing the daughter and not asking any more questions. Well, that's not a holding. You know we weren't right. That's not a holding. I didn't ask you to give me an argument. I said with respect to Batson, there are a jillion cases on the books, and I'm saying on these unique facts, you articulate to me what the cut line, if we wrote eight lines, you know, what would the holding be with respect to Batson? Don't give me the arguments. I mean, I got that, but you got to be able to tell me. People come here all the time and amazingly don't make clear what they want. They just disagree with what happened below, but that's not the test. Then that the prosecutor failed to provide a race-neutral reason, number one, and number two, the district court erred in not evaluating the race-neutral explanation properly under Batson. All right. That's fair. All right. Within those of them, my colleagues, I'm going to give you two minutes so you can shift on the conspiracy if you want to talk about it. I'm not making you talk about it, but I don't want them to talk about it, and you come back on rebuttal and say you didn't talk about it. I will address it briefly, Your Honor. I may not need all two minutes because, as the Court knows, there's a de novo review, and the record is before this Court. But with respect to our appeal of the insufficient evidence of conspiracy, what this Court has found in United States v. Galvin is that when there are multiple inferences required to prove a conspiracy, that there can be insufficient evidence of proof of a conspiracy. And what applied here, our argument is that what the government relied upon were text messages that weren't directly proven to be between my client and other drug dealers or drug users, and there was inferences made whether this was something more than a buyer-seller relationship, that there was an agreement to distribute, number one, and further, there was an inferences made in terms of how much of the drugs were in question. While the government has cited a case that recognizes we agree that the Court can extrapolate an amount, you know, if there was direct evidence of transactions, the frequency, and the amount, here, based on the testimony of the parties to the text messages, both testified they used methamphetamine as well. There's an uncertain amount of how much methamphetamine that is even being discussed, such that they could extrapolate to get to the 500 barrier for purposes of the mandatory minimum of 10 years, and we believe there's insufficient evidence of proving that conspiracy. All right. Thank you, Mr. Cobb. We appreciate it. You've reserved your five minutes for rebuttal. All right. Mr. Barr. May it please the Court. My name is Patrick Barr, and I represent the government. This Court should affirm the conviction and sentence in this case as the evidence was sufficient to prove Marshall Grace's conspiracy to distribute methamphetamine, possession with the intent to distribute methamphetamine, and the District Court did not clearly err in denying Grace's challenge under Batson v. Kentucky. I, too, will start with the Batson challenge and move to the sufficiency if I have time at the end. First, Grace did not meet his burden with regards to the third Batson step when he failed to identify how the government's race-neutral explanation for striking jury was a pretextual reason to cover purposeful racial discrimination. It seems that here we're in agreement that there's a prima facie case being made by Grace at the trial, just citing the pure percentages of African-Americans cut who are available. The second question, the second step here is whether or not the government provided a facially race-neutral reason. While Grace challenges that a little bit, I believe his counsel just said in his own argument, on its face, seven sons can be racially neutral. So that to me would say that we're in agreement here that this is a racially neutral reason. So we're really talking about the third step and whether or not that third step was accomplished correctly. Here, while it is the court's responsibility to test the veracity of the racially neutral reason, it's whether the defendant carried his burden to show that. So at that time, the defendant still has to come with a reason other than simply, I don't believe it. Here, I think it's important to break down what happened before the juror was called back up for questioning and what happened after that. Here, the Batson challenge was made and the prosecutor provided the seven sons reason there. And even if that otherwise might be facially neutral, you acknowledge that was pretty weak. Your Honor, as the Supreme Court has held and as this court has held... That wasn't my question. I said you acknowledged that that was pretty weak. I didn't say what the Supreme Court said. I mean, you're trying to keep a straight face, but you know that was weak. Your Honor, it's hard for me to say whether... I didn't say give up the game. No. I didn't say give up the game. I know you represent the United States. I used to be USA. I get that. I'm just saying that's what all triggered Judge Zaney doing what he did because the prosecutor just said seven sons and stopped. Your Honor, so I think the heart of your question here is exactly the heart of this issue, which is the prosecution... By saying seven sons, the prosecution at step two isn't required to give more than the initial reason. So it might seem weak or not great to the environment without going into the prosecution's mind more. Well, what trial strategy inference does the government draw from seven sons? Were you trial counsel? I was not, Your Honor. Oh, no. I would have got him early. No, I know he wasn't. And Mr. Lemon was the trial counsel who taught me at Loyola. So no, no, they're not here. It's been... Well, I won't use the word. Anyway, we've got appellate counsel here who can put some distance between themselves and the record. To answer your question, Your Honor, and I think opposing counsel kind of brought this up too. We're talking about seven sons. And I think that's an important distinction between seven sons and the one daughter. We know his age. He's an elderly man. So the prosecution could potentially... Be careful how you use that word. Sorry, Your Honor. You've got to know your panel here, at least with me and Judge Jones, maybe not Judge Willard. But anyway. Sorry, Your Honor. He is of an age where he might have sons who are around the same age as Grace. He might associate his sons with the defendant and perhaps be more sympathetic to him. I think when you look at the answer given, the seven sons, whether or not that strategy is a winning strategy, whether or not that strategy is what you all would have gone with, that's not the question for step two, nor is it the question for step three. As the Supreme Court has said, it doesn't have to be plausible. It just has to be race-neutral. As Judge Jones mentioned, before Batson, it could be a cut for any reason. And now it just... There's an extra step of, is it actually covering up purposeful discrimination? Let me just interject something from experience. And I know each member of the panel is the father of boys, but I will say, and their boys no doubt were angels, but I would say any man who has seven sons has likely encountered the police with one of those sons. And that's just the law of averages with young men and police. So, it may have been a very, very weak inference, but there is an inference to be drawn there that's not racial. And Your Honor, I agree with that point. And I would argue that the third weak answer... She's giving you a beach ball. I will... My secondary point to that is the inquiry that's done when he calls back up and talks to him about his family. One, I do think that it can be construed as testing the veracity of the race-neutral answer. I think that can be construed as the third step here. Judge Zaney did it somewhat of a roundabout way, but his first question is, tell me about your family. He talks to him about the sons, and then it comes out that he has this son who has had negative interaction with law enforcement and the criminal justice system. That's exactly what Judge Jones is saying here. When you have seven sons, there is a theory that could be raised by the government that you have a greater chance of having sons with negative interactions with police and law and the criminal justice system beyond any racial inference. And you do concede it was error to rely on facts that were elicited after the strike? Your Honor, I think the error, if there... Again, I think he's allowed to test the veracity of the answer given. And that test of the veracity, there's no set in stone way for a judge to do that test. I think he can test it by calling jurors up and asking them questions and continuing voir dire. I think if there's an error, it's when he says, had the government known that, that would have been the reason for the strike. I don't think that should be considered at all in the analysis on the original reason given of the seven sons. But the third step here, the inquiry by the court, is an illustrative highlighting of why seven sons is a valid race-neutral reason and why, when he makes the credibility determination, that they are not racially discriminating. That may be true, but the prosecutor dropped the ball and put the judge in a bind. Zaney should have never even had to ask those questions, which is what he inferred. Same questions he asked, the prosecutor could have said. Instead of just seven sons, ask the additional questions. And that's what Judge Zaney's inferring, that if the government had asked the same questions, the juror would have said, I have seven sons, one daughter, one's been in prison, all those questions, you know, did the system treat them fair, and so on and so forth. So not, it won't be an opinion. But I mean, the government, by just saying seven sons, Zaney's trying to deal with Batson instead of having the government ask more. Then we get all this up. Well, Your Honor, I would point out first that the first time that Juror 8 was asked these questions, he was not forthcoming, and he did not tell to answer these questions. He was asked twice if he would have any issue giving credibility to law enforcement. He did not answer that question, and he did not answer the question on family criminal convictions. So I think the government is kind of put in a bind here on that, in terms of asking questions when they don't know, he didn't respond negatively to that, which might circle back to your initial point of, hey, this might be a weak reason, but a weak reason is not racially discriminating. And that's what the case is about. My only point, having been in the chair, the government could have avoided this by asking the question, the same reason, they could have struck him, we wouldn't even be here, because there was plenty of fodder. You don't have to respond to that. It's not a question. But we wouldn't be here. So, you know, Judge Zaney, you know, asked all of that, and to the question Judge Wood asked, I mean, that's how it got off, and so the judge asked more questions, but what's then on there, I mean, there's plenty, you know, in which to strike, but, you know, that's fine. We asked counsel opposite at the end, you know, what's his demonstration of purposeful discrimination, and you heard the answer, what's your response to his answer? Well, Your Honor, there is no evidence of purposeful discrimination. First, I would point out that the first juror sat is African-American. That lens tends to show that there isn't a... That's a good point. What was the ultimate makeup? So it was 11 white jurors, one African-American juror, and one African-American alternate. I'm not sure how many alternates there were. I will also, by way of comparison to some of the cases that the Supreme Court has seen and that this Court has seen, in terms of other evidence of discrimination, we have none of that here. We don't have prosecutors who are using all of their strikes on minorities. We don't have, like, Miller L. situations where there's a pamphlet that says this is how you strike minority. These are reasons why. There isn't disparate questioning between the parties. This isn't a case where we have a weak question or a weak reason and all of this other evidence to show racial discrimination. And again, it's the defendant's burden to show the racial discrimination here. It's the defendant's burden to say, hey, look at these other things that are happening that show racial discrimination. That wasn't done. He re-urged his prima facie case at two of the four African-American potential jurors were struck. All right. You want to shift and tell us about the conspiracy charge? Your Honor, one last point. My colleague said that there was the closest thing. There was a credibility determination. The closest thing in his mind is that the judge pushed back. I would say the actual credibility determination on racial discrimination is when defense re-urges its prima facie case after step two and says they're targeting black jurors and the judge says, no, I disagree. That's not what they're doing. That's a credibility determination on racial discrimination that could and probably should have ended the bats in inquiry there. Shifting briefly to the sufficiency here. This isn't a case that's built on inferences as Grace would argue. This is a case built on evidence presented by witnesses to a criminal conspiracy to distribute methamphetamine. We have text messages, that's true, but we have text messages that the two co-conspirators, Lonnie and Tardy, explained were to and from Grace. They are messages talking about buying drugs from him, talking about Lonnie references his, Lonnie's own customers at record 1182. Tardy talks about getting product for a runner. A runner is a type of person who will then distribute drugs for him. The day of the arrest, Lonnie asked Grace for more methamphetamine for his customers. So on the quantity finding, if we disregard the admissions, what evidence is there that might independently establish the above 500 gram threshold? So, Your Honor, I just want to be clear on which admissions would hypothetically be disregarding here. That Grace admitted to the 441 grams in the trunk of his BMW, or? When I scribbled my question in the wee hours, I didn't have that level of granular detail. So he admits, and there was a motion to suppress that was denied, on that the methamphetamine in his trunk was his, and he got it from suppliers in Mississippi, and he was bringing it to Louisiana to distribute. That's, I acknowledge that that, I mean, that's a bulk of the 500 grams, 441 and change grams there. But even if you discount all of that, Lonnie and Tardy talk about the amounts that they were getting from Grace on a daily, twice or a few times a week or weekly basis here. Lonnie talks about getting one zip, which is 28 grams every day or two days beginning in 2019. The conspiracy ran to July of 2020. So we're talking 28 grams every two days, that gets a significant amount. Likewise, Tardy talks about purchasing up to one ounce, which is 28.35 grams, multiple times a week. So, you know, we're getting to 500 grams in 10 weeks, which is well within the conspiracy. That's not to even include outside of the methamphetamine found in the trunk. That's not to include what Grace says he was getting from his supplier, which was 226 grams every week from his supplier in Mississippi. So, I mean, there we get it in two weeks, which is well within the conspiracy. This isn't inferences. This is extrapolation based on, you know, Tardy doesn't say I got X hundred grams over the course of the conspiracy from him. He says, I got one zip every couple of days. And we can extrapolate, and this court can extrapolate what that means in terms of amounts. And again, I would argue that realistically, we're looking at finding a missing 50-something grams from the 500 grams because the 441 in the trunk should be associated to the conspiracy. And if there are no further questions, I ask this court to affirm the finding and sentence. All right. Thank you, sir.  Back to you for rebuttal, Mr. Conner. Thank you, Your Honors. Very briefly, Your Honors, with respect to whether we have carried our burden on purposeful discrimination, I'd like to supplement what my response earlier to your that in addition to the back and forth regarding why the prosecutor struck this one juror, we also presented in our appeal comparative juror analysis that pointed out that the prosecutor didn't strike other non-African Americans just because of the number of children. So I think that further is evidence in the record about why in this one instance was it relevant. But I don't think we necessarily even have to get there because of the district court's reaction to this explanation and finding it not to be credible. Judge Jones, I heard you ask the question about whether there could be an inference made based on the law of averages and whether the son could have gotten in trouble. And I appreciate that hypothetical, but the prosecutor didn't provide that as a reason. So I think that's beyond this prosecutor's rationale for striking the juror. They could have offered that hypothetically, but I don't think that's that inference is reflected in this record because that wasn't offered as an explanation from the prosecutor. And with respect to the government's point that the juror in question was initially not as forthcoming, that's not relevant to the inquiry here because it wasn't, because again, related to what I just said, the prosecutor wasn't, provided any indication that the reason for striking the juror had anything to do with an inference about whether one of the sons had some encounter with law enforcement. And so while that's an unfortunate aspect of the trial transcript, it doesn't necessarily change what I think is the purpose under Batson is evaluate the prosecutor's reasoning to reason, not figure out is there another reason for why this particular juror should have been stricken. In response to the colloquy between the district court where he did say he disagreed about purposeful discrimination, that was at a time when the parties were discussing, they went back to the prima facie case, and the district court was disagreeing with whether overall there was purposeful discrimination. I don't read that statement as finding in this one instance that there wasn't purposeful discrimination, and it couldn't have been because the district court still decided to conduct an additional inquiry. I'm not saying that inquiry was proper, but the intent behind the additional inquiry was because the district court still had questions about whether there was purposeful discrimination in this instance. So simply disagreeing that there wasn't necessarily discrimination in all of the jury selection isn't the same thing as finding there's no discrimination in this one instance. And, Your Honor, I'll briefly touch on the conspiracy charge and with respect to the amount, while there was a substantial amount found in a vehicle, to get over the 500 threshold, the government had to rely on, didn't have the physical evidence that would have been tested in a way and had to rely on inferences. The evidence had inferences over the amount being discussed. And again, I want to emphasize that the people who were part of the exchanges were also users. So there's not, it is an unknown amount of how much drugs is being extrapolated from and multiplied to reach the 500 threshold. And I don't think it's a matter of figuring out relative percentages of 500. Every gram, of course, matters because we're talking about a statutory crime that has a threshold amount of 500 that needs to be satisfied with proof beyond a reasonable doubt. If there's no other questions, Your Honor, thank you for your time. All right, Mr. Cottle, before you leave the podium, on behalf of Judge Jones, Judge Willett, myself, and the court as a whole, we supremely appreciate your willingness to serve as court appointed counsel in these cases. It's a tough assignment to, and I haven't been the trial counsel, to take these briefs and records and try to discern plausible arguments. And the fact that you were willing to brief the case, but also to come and answer our questions today, doesn't go without notice. So we appreciate your willingness to serve as CJA counsel, the excellence in which you presented yourself in and brief and oral argument. And with that, the court thanks you. Thank you, Your Honors. Thank you.